Filed 8/31/22  P. v. Gross CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DWIGHT GROSS,<br><br>    Defendant and Appellant. | D079878<br><br><br>(Super. Ct. No. MCR056168) |

APPEAL from a judgment of the Superior Court of Madera County, Mitchell C. Rigby, Judge.  Affirmed in part and remanded with directions.

Spolin Law and Aaron Spolin for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A fight broke out at a bar between members of the Crips gang and the Bloods gang on New Year's Eve 2012.  The conflict continued into the next

morning when Dwight Gross, a known member of the 1200-block Seaside Crips, shot and killed Gerald Warren, a former rival Bloods gang member. In 2019, a jury convicted Gross of first degree murder with the gang-murder special circumstance and the gang sentencing enhancement. (Pen. Code,[1] §§ 187, subd. (a), 189, 190.2, subd. (a)(22), 186.22, subd. (b)(5); count 1.) The jury also convicted Gross of the substantive crime of active participation in a criminal street gang. (§ 186.22, subd. (a); count 2.) On appeal, Gross asserts there was insufficient evidence to support the jury's verdict, the trial court erred by allowing the prosecutor to introduce evidence of uncharged crimes involving Gross to prove motive and intent, and the People violated Gross's due process rights by committing *Brady*[2] error. We find no error on these grounds.

While his appeal was pending, the Legislature enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) and Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81). Assembly Bill 333 made several changes to section 186.22, including amending the definition of what constitutes "a criminal street gang" and "a pattern of criminal gang activity," and added a new section 1109 requiring bifurcation of the gang enhancement upon the defendant's request. Senate Bill 81 amends section 1385 to now require the trial court to consider specific enumerated mitigating factors in exercising its discretion to strike or dismiss a sentencing enhancement. In supplemental briefing, Gross asserts these recent statutory amendments require that his convictions be reversed and the matter remanded.

---

[1]  All further unspecified statutory references are to the Penal Code.

[2]  *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

2

As the Attorney General properly concedes, we conclude the new statutory amendments to section 186.22 apply retroactively to Gross under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). We disagree, however, with the Attorney General that incorporating those very same amendments into the gang-murder special circumstance under section 190.2, subdivision (a)(22), would constitute an unconstitutional amendment to Proposition 21. Consequently, we vacate the true findings on the gang-murder special circumstance (§ 190.2, subd. (a)(22)) and the gang sentencing enhancement (§ 186.22, subd. (b)(5)) on count 1, as well as the conviction on count 2 for active participation in a criminal street gang (§ 186.22, subd. (a)). We conclude new section 1109 is not retroactive under *Estrada* and does not entitle Gross to a new, bifurcated trial on his first degree murder conviction and the attached firearm enhancements. The matter is remanded to the trial court for further proceedings consistent with this opinion. The changes implemented by Senate Bill 81 shall apply to resentencing on remand.

FACTUAL AND PROCEDURAL BACKGROUND

Gross is a known member of the 1200-block Seaside Crips gang and goes by the moniker of "Dirt." On New Year's Eve 2012, Gross went to Frankie's Bar with fellow associates Preston P., Krystian P., Sharay P., and Deshawn L., to party with another Crips gang member, Donald "Boo Boo" D. About half an hour after the group arrived at Frankie's Bar, a group of the rival Bloods gang showed up, dressed in red and "acting like gang members."

Deshawn was on the dance floor with a girl. He and several other people were doing a dance called "Crip-walking" and "throwing up gang signs." Elvin L., who was the girl's boyfriend and Warren's cousin, entered the bar and a fight broke out. Someone hit Deshawn over the head with a

3

bottle and "[a]ll hell broke loose." There was a scuffle, people started fighting, and it turned into "a brawl."

The victim, Warren, arrived at Frankie's Bar sometime after midnight. He was with his brother Howard, his fiancée Kelly H., and Kelly's friend, Laura L. The bar was "packed" at capacity and they were not able to get in past the entrance. While waiting outside, Warren's group heard the commotion in the bar. The police arrived around 1:20 a.m. on January 1, 2013 and the bar's security started to clear everyone out. Warren's group began walking back to Warren's car when Warren saw his cousin Elvin, whom he referred to as "Little T," come out of the bar looking "worked up." Warren told Kelly, " 'That is my cousin . . . I got to go check on him, make sure he is okay. He is in there fighting.' "

Warren was unable to find Elvin, so he drove his group to the home of Elvin's relative, thinking Elvin might be there. The house was on a cul-de-sac on Millview Drive, an area that several witnesses referred to as the "U." Warren and the others in his car did not see anyone when they first arrived at the cul-de-sac. But, just as they were about to leave, Elvin pulled up. Elvin told Warren, "We got into a fight," and ran into the house. Warren and the others stayed in the car.

Meanwhile, Donald "Boo Boo" D. had "made the call so [the group of Crips] could go fight, because Deshawn had just got hit with a bottle in the face." Following Donald's call, at least four cars of Seaside Crips pulled into the cul-de-sac on Millview Drive, including Gross, Donald, Preston, Krystian, and Sharay. Gross was riding in a Cadillac Escalade driven by Preston, along with Krystian, and Sharay. The caravan of cars pulled up near where Warren was parked. Gross and the other men got out of Preston's vehicle and approached Warren's car. Warren got out of his car. The Seaside Crips

4

group walked towards Warren and started asking, "where is the big damu at?" or "who the big damu was." Damu means "Blood" or "blood-like" in Swahili; it is a term Blood gang members sometimes use to refer to themselves.

Warren and several Seaside Crips exchanged words. Things began to escalate. Warren, who was approximately 6 feet 6 inches tall and "very large . . . both muscular and obese," punched Sharay. Sharay fell to the ground, unconscious. Other Seaside Crips attacked Warren and a melée ensued. Howard tried to help Warren, but they were outnumbered. Kelly got out of Warren's car and went around the side of it to "shield" herself. After a while, the Seaside Crips group retreated towards their cars and started "regrouping themselves." Warren came around his car, close to Kelly, to try and catch his breath. But the Seaside Crips group started advancing again.

Gross ran back to Preston's Cadillac Escalade and retrieved a black and silver Smith & Wesson handgun. Preston saw "a few guns come out" and Gross had a gun. Preston pleaded with Gross, "Dirt don't do that." Gross responded, "Fuck that." Kelly saw someone, whom she later identified as Gross, with a gun. Gross came up to Warren and demanded to know, "Where is the nigga that hit my homie?" Gross raised his gun and shot Warren in the chest, from four to five feet away. Warren fell to the ground after the first shot, but Gross continued to shoot. Gross fired nine shots in all. Warren sustained six gunshot wounds to his chest and a seventh gunshot wound to his left forearm. Kelly and others attempted to perform life saving measures, but Warren died from his injuries.

After the shooting, the Seaside Crips group ran back to their cars and sped away. A sweatshirt with "Seaside," seven .40 caliber shell casings, and a broken watch were left at the crime scene.

Gross was charged with Warren's murder in 2017. In April 2019, a jury convicted Gross of first degree murder with the gang-murder special circumstance (§§ 187, subd. (a), 189, 190.2, subd. (a)(22); count 1), and the substantive crime of active participation in a criminal street gang (§ 186.22, subd. (a); count 2). As to the murder in count 1, the jury also found true Gross personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (c) and (d)) and he committed the murder for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(5)). As to both counts 1 and 2, the jury further found true that Gross personally used a firearm within the meaning of sections 12022.5, subdivision (a)(1), and 12022.53, subdivision (b).

In July 2019, the trial court sentenced Gross on count 1 to a term of life without the possibility of parole for the first degree special circumstance murder conviction, plus a consecutive term of 25 years to life for the firearm enhancement. The court imposed and stayed sentences on count 2 and the remaining enhancements, pursuant to section 654. Gross timely appealed.

DISCUSSION

I.

*Substantial Evidence Supports the Jury's Verdict*

Gross asserts the evidence at trial was insufficient to support the jury's verdict. He does not dispute Warren was shot to death in the early morning hours of January 1, 2013, or that the shooting occurred during a conflict between rival gang members that carried over from Frankie's Bar. The identity of the shooter was the primary fact issue at trial, and he contends only that there was insufficient evidence to prove he was the shooter. We disagree.

6

On appeal, we consider the whole record in the light most favorable to the judgment " 'to determine whether it discloses *substantial evidence*—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260.)  We "view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence." (*People v. Reed* (2018) 4 Cal.5th 989, 1006 (*Reed*).)  We do not determine the credibility of witnesses, and accept " ' "the statements given by a witness who has been believed by the [trier of fact]," ' " unless there is " ' "a physical impossibility that they are true, or their falsity [is] apparent without resorting to inferences or deductions." ' " (*People v. Barnes* (1986) 42 Cal.3d 284, 306.)  The uncorroborated testimony of a single witness is sufficient to sustain a conviction.  (*Reed,* at p. 1006; *People v. Young* (2005) 34 Cal.4th 1149, 1181 (*Young*).)  The fact the circumstances could be reconciled with a contrary finding does not warrant reversal of the judgment.  (*People v. Bean* (1988) 46 Cal.3d 919, 932–933; accord *Barnes,* at p. 306.)  And because an appeal is not a retrial and we give due deference to the trier of fact, an appellant challenging the sufficiency of the evidence "bears an enormous burden." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

Applying these principles of the governing standard of review, we have no difficulty concluding there was substantial evidence to support the jury's verdict.  Three eyewitnesses—Kelly, Krystian, and Preston—identified Gross as the shooter.

A.    *The Evidence*

    1.    *Kelly's Testimony*

Kelly was Warren's fiancée and present during the shooting.  She testified she was "[a]bout four feet" away from Warren when the fighting broke out on the cul-de-sac.  She went around Warren's car to shield herself, but could see "silhouettes of [Warren] . . . hitting [and] . . . fighting."  When there was a pause in the fighting, Warren came back around to his car near Kelly, just before he was shot.  Kelly saw the shooter was no more than 10 feet away from Warren.  The street light down the street was not on, but "there [were] headlights from vehicles that were there" and the porch light to the house was on.  Although it was dark, Kelly testified she had a "clear view" of what was happening.

Kelly did not know Gross and had never seen him before that New Year's Day morning.  In the hours and days immediately after the shooting, Kelly was unable to identify or describe the shooter in any detail.  She was upset and "still pretty much in shock."  Approximately one month later, Kelly received a photograph in a text message from Warren's brother, Dan.  Dan told Kelly the person in the photograph was "bragging" about Warren's murder.  Kelly recognized the person in the photograph as Warren's shooter.  She immediately called the police and later showed a detective the photograph.  The detective then showed Kelly a six-pack photographic line-up that contained a booking photograph of Gross.  Kelly identified Gross as the man who shot Warren from the photographic line-up, and she identified Gross as the shooter in court at trial.  She testified she had "[n]ot a doubt at all" Gross was the man who killed Warren.

The jury, as the trier of fact, was entitled to credit Kelly's testimony (see *People v. Smith* (2005) 37 Cal.4th 733, 738–739 (*Smith*) ["it is the

8

exclusive province of the . . . jury to determine the credibility of a witness"]), and her testimony was sufficient, on its own, to support the jury's finding that Gross was the shooter. (See *Reed, supra,* 4 Cal.5th at p. 1006 ["Even identification of [the] defendant by a single eyewitness may be sufficient to establish, beyond a reasonable doubt, defendant's identity as perpetrator of the crime charged."]; *Young, supra,* 34 Cal.4th at p. 1181 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].) But Kelly's testimony was not the only evidence identifying Gross as the shooter. Her testimony was corroborated by two other witnesses, Krystian and Preston.

      2.    *Krystian's Testimony*

Unlike Kelly, Krystian knew Gross well. Krystian and Gross were both members of the Seaside Crips, and Krystian had known Gross since he was around seven years old. They socialized regularly, including over the New Year's holiday when Gross was murdered, and had committed prior shootings together.

Krystian testified he and Gross were at the cul-de-sac on Millview Drive, along with other members of the Seaside Crips, "to fight" but the person they were supposed to fight ran into a house. The only other person in the cul-de-sac was a "big, tall dude with dreads," later identified as Warren. Donald and Sharay approached Warren, and Warren hit Sharay, knocking him out. Krystian testified "a bunch of the other members" then attacked Warren. There was a fight that went on for five to ten minutes. Although he was outnumbered, Warren was holding his own. Krystian testified he saw Gross run back to Preston's Cadillac Escalade and get a gun. Gross then walked straight up to Warren, until he was "close" and "within reaching distance" of Warren, and shot him. Warren fell to the ground and Gross shot

9

him "a couple more times."  Krystian was not sure exactly how many rounds Gross fired, but believed it was maybe five or six.  Krystian estimated he was 10 feet away from Gross and 12 feet away from Warren when Gross shot Warren.

### 3. *Preston's Testimony*

Krystian and Preston each testified Preston was not a gang member. Preston was "a friend" and had associated with Seaside Crips gang members on more than one occasion, including when Warren was killed.  Preston testified he saw Gross with a gun seconds before shots were fired but did not see him shoot.

Preston testified he drove at least Krystian and Sharay in his Cadillac Escalade from Frankie's Bar to the cul-de-sac on Millview Drive.  When they got there, Preston and Sharay got out of the Escalade first.  He and Sharay approached Warren, whom Preston described as a "big guy," and there was a confrontation.  Warren "knocked Sharay . . . out."  Warren took a swing at Preston, Preston hit Warren, Warren stumbled, and then someone else hit Preston.  Preston said the blow caused him to fall and "basically knocked [him] out [of his] shoe."  As he was trying to put his shoe back on, Preston saw "a few guns" come out.  Gross had a gun and Krystian had a gun. Preston pleaded with Gross, "Dirt, don't do that," by which Preston meant "don't kill anybody."  Gross responded, "Fuck that."  "Shots went off . . . [b]etween 5 and 10 seconds" later.  Although Preston testified he did not actually see Gross shoot Warren, the jury could reasonably deduce from Preston's testimony, along with Kelly's and Krystian's testimony, that Gross was Warren's assailant.  (See *People v. Nelson* (2016) 1 Cal.5th 513, 550 ["In determining whether a reasonable trier of fact could have found [the defendant] guilty beyond a reasonable doubt, we presume in support of the

10

judgment ' "the existence of every fact the trier could reasonably deduce from the evidence." ' " ].)

B.    *Gross's Contentions*

Despite three independent eyewitnesses identifying Gross as the shooter, Gross contends the evidence was insufficient to support the verdict. First, Gross argues no DNA evidence tied him to the crime scene. But this point is of no moment. Three witnesses—Kelly, Krystian and Preston—placed Gross at the scene with a gun in his hand. The jury was made aware that Gross's DNA was not found on any of the items recovered at the crime scene.[3] As the exclusive trier of fact, the jury was entitled to give whatever weight it deemed appropriate to that evidence, or absence of evidence. Here, there was ample evidence from which the jury could have concluded beyond a reasonable doubt that Gross was present at the scene of the murder. Gross's assertion to the contrary, like the rest of his assertions, improperly asks us to reweigh the evidence, resolve conflicts in the testimony, or make credibility findings. (See *Young, supra,* 34 Cal.4th at p. 1181 ["In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts."].)

---

[3]    The following stipulation was read to the jury at trial:  "The following evidence collected at the Millview Drive murder scene on January 1st, 2013, were sent to the California Department of Justice for forensic testing[:] Seven 40-caliber shell casings, a sweatshirt and a watch.  None of these items tested or collected at the scene had the DNA of the Defendant, Dwight Gross, on them.  DNA of at least three individuals was found on the cuff of the sweatshirt collected at the scene.  A major contributor in a DNA match was made to a person, Kenneth Wayne Gerard.  It is unknown who the other two contributors are; however, the Defendant, Dwight Gross, is not one of them. Also, it was determined that the seven shell casings collected were fired from the same firearm.  The firearm used in this shooting; however, has not been found, collected, or tested by law enforcement."

11

Second, Gross asserts Kelly's testimony was "problematic." He contends her testimony was inconsistent with her first statement to the police and contradicted by other witnesses. He points out that in the hours and days immediately following the shooting, Kelly was unable to identify the shooter, or provide a description. The morning after the shooting, Kelly told an officer she was in the house when the shooting happened.[4] Gross also points out that Kelly had previously identified Preston as Warren's shooter in a prior, different trial. Even so, the jury was aware of the inconsistencies in Kelly's testimony, and it was entitled to make a credibility finding in light of those inconsistencies. (See *People v. Elliott* (2012) 53 Cal.4th 535, 586 (*Elliot*) [reliability of witness identification, including whether the witness was influenced by a composite drawing, was a credibility issue for the jury to resolve].)

Here, the officer who first interviewed Kelly testified and explained to the jury that interviews conducted at the crime scene are generally "quick and dirty" and witnesses at a "curbside interview right after a traumatic event" may be nervous and upset and, if a lot of people are around, they may be "afraid to be considered a snitch or retaliated upon." The officer confirmed there were "close to 30 people around" when he interviewed Kelly at the crime scene. In his opinion, "she definitely wanted this interview to be done [and] over with," which could have been a function of "the amount of people there . . . , or her husband laying there shot." The police sergeant who interviewed Kelly a day and a half after the shooting testified she was "upset" and "still pretty much in shock" when he spoke with her. In his experience,

_____

4     Gross asserts another witness, Alondo M., also testified Kelly came out of the house after he arrived, but that witness admittedly did not arrive on the scene until "maybe five to six minutes" after the shooting occurred.

"some people have a great memory early, some people do better with a little rest and time to calm down and get over some of the trauma they went through." The jury could have reasonably concluded from both officers' testimony that Kelly's testimony at trial was more reliable than the initial statements she gave shortly after she witnessed her fiancé's murder.

As Gross contends, Kelly did admit she incorrectly identified Preston as Warren's shooter at a previous trial in which Preston was charged with a different murder.[5] Kelly testified she was subpoenaed to appear in a different courthouse in March 2017, three years after Warren's murder. No one told her specifically what the case was about, but she wrongly assumed it was about Warren's murder. During her testimony in Preston's trial, the prosecutor showed Kelly the same six-pack photographic line-up she had seen in the investigation of Warren's murder. Kelly again identified the same photograph of Gross as the person who shot Warren, but she also identified Preston, sitting at the defense table, as the same person depicted in the photograph of Gross. It was only later that Kelly learned the defendant in that case was actually Preston, not Gross.

At Gross's trial, Kelly explained Gross and Preston "were similar," she had not seen the shooter in years, and she thought the defendant "might be thinner [and] look different" after being in jail. In this case, Kelly looked at the photographs of both Preston and Gross and testified she had "[n]ot a

---

[5]    Preston was charged and acquitted of the murder of a rival Norteño gang member, Jorge "Fat Boy" Diaz (the Diaz murder). The Diaz murder was an uncharged crime admitted over Gross's objection to allow the People to show intent and motive pursuant to Evidence Code section 1101, subdivision (b), and to establish the predicate acts of a pattern of criminal gang activity to prove the gang enhancement allegation. We discuss Gross's challenge to this evidence, *post*.

doubt at all" that Gross was the person that shot Warren. Again, the jury was entitled to weigh the evidence, including Kelly's explanation of the previous mistake, and credit her positive identification of Gross as the shooter in this trial. (See *Elliott, supra,* 53 Cal.4th at p. 586 [reliability of witness identification is an issue for the jury].)[6]

Third, Gross asserts Krystian and Preston had "very strong incentives to lie" and "their testimonies were inherently suspect" because Krystian was testifying against him as a result of a plea deal and Preston was a "twice-convicted felon." All of this information was presented to the jury.

Krystian testified he had pled guilty to attempted murder in another case and struck a deal with the People that required him "to testify against the Seaside Crips in different matters," including Warren's murder, in exchange for a reduction of his sentence from 17 to 7 years. He testified he was still awaiting sentencing and told the jury that if he got caught lying, "My deal goes away and I do 17 years."

Preston testified he initially spoke to law enforcement about Warren's murder while awaiting his own trial for another murder, and "[t]hey offered [him] a deal." He said his lawyer told him, "[y]ou need to tell the truth, but they can't use it unless they offer you or give you a deal," but the deal "never happened." Preston was initially reluctant to testify against Gross, and said he did not remember "telling the police anything." He eventually testified under a prosecutorial grant of immunity. He explained he did not have immunity from perjury and had an obligation to tell the truth as best as he

---

[6]     Gross's remaining arguments about the veracity of Kelly's testimony are similarly based on evidentiary conflicts the jury was entitled to resolve. We similarly dispose of them on the same grounds that it was the province of the jury to weigh any conflicting evidence. (See *Smith, supra,* 37 Cal.4th at pp. 738–739.)

14

could recall. Gross's trial counsel cross-examined him extensively regarding his prior statements and, specifically, whether he was telling the police what they wanted to hear to get a deal and whether he thought he would "get in trouble" if he said something different now.

Again, as with all witnesses, the jury was entitled to weigh all relevant testimony and make their own credibility determinations as to Krystian and Preston. Here, there was independent evidence corroborating both men's testimony: Kelly identified Gross as the shooter. Neither of the men knew Kelly, and Krystian testified he was unaware of Kelly's identification when he gave his statement to law enforcement identifying Gross as the shooter. Krystian testified there was a danger in his mind to testifying against the Seaside Crips, but he was positive that Gross was the person who shot Warren. When asked if he feared retaliation for testifying against his fellow gang member, Krystian said, "Maybe." From this, the jury could also have reasonably concluded that Krystian (and Preston) was credible because he was willing to testify despite the fear and potential of retaliation. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1313 [evidence the witness " 'was willing to testify against a former member of the group despite his fear of retaliation was supportive of the credibility of his testimony' "].)

Lastly, relying on section 1111, Gross asserts the jury could not rely on Krystian's testimony without corroboration, because Krystian was an accomplice to the murder. Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Gross's argument fails for two reasons. First, assuming there is evidence to establish Krystian

15

as an accomplice, Kelly's testimony was not only sufficient evidence to identify Gross as the shooter, but it was also sufficient corroboration of Krystian's testimony under section 1111. Second, the trial court properly instructed the jury that if they decide a witness was an accomplice, they may not convict the defendant of murder based on the accomplice's statements or testimony alone. We presume the jury understood and followed that instruction. (See *People v. Martinez* (2010) 47 Cal.4th 911, 957 (*Martinez*).) Thus we infer from the jury's verdict the jury either did not convict Gross based solely on Krystian's testimony, or it concluded Krystian was not an accomplice.

In sum, all relevant evidence was presented to the jury, and it was the jury's exclusive province to weigh the evidence and make credibility findings. (See *Smith, supra,* 37 Cal.4th at pp. 738–739.) "[W]e presume in support of the verdict the existence of every fact that can be reasonably inferred from the evidence." (*People v. Houston* (2012) 54 Cal.4th 1186, 1218.) Even where there is conflicting evidence that may support contrary factual findings, we may not reverse the judgment so long as there is substantial evidence to support the findings the jury did make. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) We conclude the record as a whole contained more than substantial evidence to support the jury's verdict.

II.

*The Trial Court Did Not Abuse Its Discretion by Admitting Evidence of Uncharged Crimes*

The trial court allowed the prosecution to introduce evidence of an uncharged crime—the October 2012 murder of Jorge "Fat Boy" Diaz, allegedly committed by Gross—pursuant to Evidence Code section 1101, subdivision (b), to prove intent and motive in Warren's murder, and to

16

support the active gang participation charge (count 2) and the gang enhancement.  During defense counsel's cross-examination of Krystian, evidence of Krystian's commission of the September 2012 gang-related attempted murder of Catarina E. was also introduced.  Gross argues evidence of both uncharged crimes was highly prejudicial and its admission violated his right to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.  We disagree, and conclude the trial court's evidentiary ruling was well within the bounds of its discretion.

A.    *The Uncharged Offenses*

1.    *The Diaz Murder*

Preston and Krystian each testified about the murder of Jorge Diaz, a Norteño gang member who went by "Fat Boy."  In October 2012, Krystian and Preston attended a barbeque at the home of two 1700-Block Seaside Crips,[7] along with Gross, Sharay, and a number of other Seaside Crips gang members.  There had been a drive-by shooting at the house the night before and a second drive-by shooting that evening during the barbeque.  The Crips believed a rival gang, the Norteños, was responsible for the shootings.  According to Krystian, two cars of Seaside Crips went out to find someone from the Norteño gang to retaliate against.

Preston drove Gross and Sharay in one car, along with two other Seaside Crips gang members.  Krystian was in another car.  The men in Preston's vehicle saw a person who appeared to be a member of the Norteño gang.  They stopped at a traffic light and Gross got out of the car with a

_____

[7]    The 1700-Block Seaside Crips and 1200-Block Seaside Crips are different sets of the Seaside Crips gang.

17

"pretty nice-sized" handgun. Preston heard 9 to 10 gunshots, and then Gross got back into his car. Gross then called Krystian and told him to stay in the house because "Fat Boy" had just been killed.[8] Gross told Krystian "that he chased [Fat Boy] and shot him in the street." Krystian testified, respect is one of the "most important things in a gang." And if one gang shot at another gang, that gang was expected to promptly respond in order to maintain a sense of fear on the other side.

2.     *Attempted Murder of Catarina E.*

Krystian admitted he shot Catarina E. in September 2012, in another gang-related shooting. But contrary to Gross's assertion, it was not the prosecutor who introduced evidence of the Catarina shooting. Defense counsel asked Krystian during cross-examination, "you chose to be here because you shot someone and got caught?" Krystian answered, "Yes." It was only when Defense counsel asked Krystian if he was familiar with Catarina that Krystian testified about his role in that shooting and another subsequent gang-related shooting.

Krystian testified he shot at Catarina, a rival Norteño gang member, and admitted the shooting was "gang-related." Krystian testified Gross was with him in that shooting, and they had discussed what they were going to do beforehand. Krystian also admitted shooting at someone else in 2014, after Warren's murder. He testified Gross was the driver in this second shooting

---

8      Preston admitted he was the driver, but testified they were going to a liquor store when they saw a Norteño gang member walking down the street. He claimed he did not have any idea someone was going to get shot. As previously noted, Preston was subsequently tried for the Diaz murder. He testified he was not sure, but he did not believe anyone at his trial accused him of being the actual shooter. The jury acquitted Preston on the charges of first and second degree murder and manslaughter.

and it was also gang-related. Krystian was charged with attempted murder in connection with this second shooting; this is the case in which he made the deal that required him to testify against Gross in exchange for a reduced sentence.

B. *Analysis*

Evidence Code section 1101, subdivision (a), "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*)), "such as motive, opportunity, intent, preparation [or] plan" (Evid. Code, § 1101, subd. (b)).

Evidence of uncharged offenses may be admissible to prove intent if the prior crimes are sufficiently similar to the charged offense to support an inference " 'the defendant " 'probably harbor[ed] the same intent in each instance.' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 25 (*Chhoun*); accord *People v. Williams* (1997) 16 Cal.4th 153, 193 (*Williams*) ["gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect"]; see also *Ewoldt*, *supra*, 7 Cal.4th at pp. 402–403 ["The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent."].) As our high court recently confirmed, " ' "[w]e have long recognized 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance' [citations], and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be

19

drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." ' " (*People v. Roldan* (2005) 35 Cal.4th 646, 706; *Chhoun,* at p. 27, quoting *Roldan* at p. 706.)

"As with other evidentiary rulings, the trial court's decision [to admit evidence of uncharged offenses] is reviewed for abuse of discretion." (*Chhoun, supra,* 11 Cal.5th at p. 26.) " ' "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid.*) " 'This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 414.)

Here, the prosecution's main factual theory of the case was that Warren's murder was carried out to defend members of the Seaside Crips and their reputation. The prosecution's gang expert testified Gross had at least five different gang-related tattoos, including one that said, "do dirt." As previously noted, "Dirt" was Gross's moniker and the expert explained, "[d]oing dirt means committing a crime." The expert testified, consistent with Krystian's testimony about the motive and intent in the Diaz murder, that: "Respect is pretty much everything within the gang culture. . . . If you're disrespected, then you're expected to do some type of violence against that person to gain that respect back." And "[i]n general, the Crips enemies

20

are the Bloods." Additionally, testifying about Warren's murder, Preston explained it would be disrespectful to the Seaside Crips if someone that was hanging out with them was assaulted, regardless of whether that person was a Crip. Here, Deshawn and Sharay were both assaulted while hanging out with the Seaside Crips shortly before Warren's murder. As Krystian testified, "once Deshawn got in the altercation [at Frankie's Bar], it became a gang thing."

The evidence of the uncharged offenses, and particularly the Diaz murder, was probative of Gross's motive and intent in the Warren murder because it established a similar motive and intent to retaliate against a rival gang, consistent with the prosecution's theory of the case.[9] The Diaz murder involved several of the same Seaside Crips gang members as the charged murder, namely Gross, Krystian, Preston, and Sharay. Gross, Krystian, and Sharay were all members of either the 1200-Block or 1700-Block Seaside Crips,[10] as was Deshawn (who was involved in the brawl at Frankie's Bar that lead to Warren's murder). In both the Diaz murder and the charged murder of Warren, there was an earlier precipitating violent conflict between members of the Seaside Crips and members of a rival gang.

---

[9]     Although the primary issue at trial was the identity of the shooter, the defendant's "not guilty plea places in issue all elements of the charged crimes," requiring the prosecutor to prove malice and premeditation for a first degree murder beyond a reasonable doubt. (*Chhoun, supra,* 11 Cal.5th at p. 29.)

[10]     The prosecution's gang expert testified there was "tight cooperation" between these two different sets of the Seaside Crips gang. In a photograph admitted at trial, Gross was depicted throwing up gang signs for both the 1200-Block and 1700-Block sets of the Seaside Crips at the funeral for another gang member.

Gross's response to the shootings that occurred the night before and during the Seaside Crips' barbeque in October 2012 was to retaliate against the rival gang perceived to be responsible for the attack against the Seaside Crips. Gross's retaliatory act was to shoot down Diaz, a Norteño gang member, in the street. That murder occurred just two months before Gross committed Warren's murder, which also centered around an earlier violent conflict between Gross's gang and a rival gang. Evidence of the Diaz murder raised a reasonable inference that Gross harbored the same intent when he shot Warren, that is to defend the reputation of his gang by a retaliatory shooting of a rival. (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212 (*Zepeda*) [evidence of prior drive-by shooting relevant to prove motive and intent in gang shooting case]; accord *Chhoun, supra,* 11 Cal.5th at p. 27 [evidence of murders committed during a prior home invasion robbery tended to prove a common intent "to kill any or all resident if necessary to successfully complete the robbery" in both the uncharged and charged offenses].)

Although initially raised by the defense, the evidence of the two shootings committed by Krystian supported that same inference of Gross's motive and intent. As Krystian admitted, both shootings were gang-related and Gross was directly involved in both. Gross and Krystian discussed their plan to retaliate against their rival ahead of time, and Gross was the driver for the second shooting. Along with the other evidence at trial, the Diaz murder and the other two gang-related shootings by Krystian demonstrated similar motive and intent in which members of the Seaside Crips would retaliate against perceived threats or disrespect from a rival gang by shooting their rivals. The evidence supported a reasonable inference that Gross

22

harbored a similar intent to defend the reputation of the Seaside Crips when he fatally shot Warren.

But even where evidence of an uncharged offense is relevant to prove intent, the trial court must still conduct a prejudice analysis under Evidence Code section 352. (See *Chhoun, supra,* 11 Cal.5th at p. 26 ["Even if evidence of the uncharged conduct is sufficiently similar to the charged crimes to be relevant for a nonpropensity purpose, the trial court must next determine whether the evidence's probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' "]; accord *Ewoldt, supra,* 7 Cal.4th at pp. 404–405.) Evidence of uncharged offenses is, by its nature, inherently prejudicial. (See *Ewoldt*, at p. 404 ["Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis.' "]; accord *People v. Tran* (2011) 51 Cal.4th 1040, 1044 (*Tran*) ["Without doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial."].) Trial courts should carefully scrutinize evidence of gang membership, in particular. (*Williams, supra,* 16 Cal.4th at p. 193.) " 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' " (*Ewoldt*, at p. 404.)

Here, the trial court acknowledged the prejudicial nature of the evidence of the uncharged offenses and, specifically, the Diaz murder. The court conducted a proper analysis in accordance with Evidence Code section 352, and concluded the probative value of the evidence was substantially outweighed by any substantial danger of undue prejudice. The court explained, in the context of its preliminary ruling on the People's motion in limine to admit evidence of the Diaz murder: "Even considering under

23

[Evidence Code section] 352 prejudice versus probative value, I do not see any prejudice here undue as opposed to probative value. I think the probative value is high or may be high. I have not heard the testimony, but just as described by counsel, we'll see where we come along. And there is no -- I don't see it as undue prejudice. It is prejudicial to the extent that the jury may come to the conclusion that, based upon those acts, Mr. Gross had some involvement, but it is not unduly prejudicial."

We perceive nothing arbitrary, capricious, or patently absurd in the trial court's evidentiary ruling. (See *Chhoun, supra,* 11 Cal.5th at p. 25 [a reviewing court will not disturb the ruling " ' " 'unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner' " ' "].) The court's decision was within the bounds of its discretion. As we have discussed, the evidence of the uncharged offenses was highly probative of Gross's motive and intent. Although the evidence was inherently prejudicial for the reasons expressed in *Ewoldt* and *Tran*, the prejudice did not rise to a level that required exclusion.

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence *which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues*.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638 (*Karis*), italics added; accord *People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [quoting *Karis*].)

24

Here, there was minimal risk the evidence of the Diaz murder would evoke a unique emotional bias against Gross. The evidence was no more inflammatory than the evidence of the charged murder of Warren, in which three separate witnesses identified Gross shooting an unarmed Warren at close range. Further, Gross was not even the shooter in the other two shootings committed by Krystian. That evidence was even less likely to evoke an emotional bias or otherwise prejudice the jury against Gross. (See *Karis, supra,* 46 Cal.3d at p. 638; *Tran, supra,* 51 Cal.4th at pp. 1047–1049 [prejudice is decreased where the evidence of the uncharged offense is no stronger or more inflammatory than the evidence of the charged offense].)

Further still, the trial court gave the jury a limiting instruction, telling them they could only consider evidence of "other behavior by [Gross] that was not charged," and specifically evidence that Gross killed Diaz, "for the limited purpose of deciding whether the defendant acted with the intent to kill Gerald Warren or the defendant had the motive to commit the offenses alleged in this case."[11] Gross asserts it "defies credulity" to believe the jury could have restricted its use of the evidence in accordance with the court's instruction. As he surely knows, we are required to presume the jury understood and followed the trial court's instruction. (See *Martinez, supra,* 47 Cal.4th at p. 957.)

---

[11]    We acknowledge the trial court did not provide a limiting instruction as to the two shootings admitted by Krystian but, defense counsel did not ask for such an instruction and, as noted, it was defense counsel who introduced evidence of those shootings. Defense counsel asked only for a limiting instruction as to the Diaz murder. The trial court did not have a sua sponte duty to provide any further limiting instruction. (See *People v. Collie* (1981) 30 Cal.3d 43, 63 ["Although the trial court may in an appropriate case instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct, we have consistently held that it is under no duty to do so."].)

Gross asserts evidence of the uncharged offenses was not admissible, or necessary, to prove the crime of active participation in a gang, as charged in count 2, or the gang sentencing enhancement. He argues the prosecution had already introduced evidence of two other predicate offenses, which were less inflammatory.[12] This argument overlooks that evidence of the Diaz murder and Krystian's commission of two gang-related shootings was *separately* relevant and probative of Gross's motive and intent in Warren's murder. (See *Zepeda, supra,* 87 Cal.App.4th at p. 1212 [evidence of prior drive-by shooting relevant to prove motive and intent]; see also *Chhoun, supra,* 11 Cal.5th at p. 27 [prosecutor has the burden of proving premeditation and malice beyond a reasonable doubt].) The prosecutor argued evidence of the Diaz murder was admissible for two separate reasons: (1) to show motive and intent, and (2) as predicate offenses for the gang sentencing enhancement and the substantive gang crime. He relied primarily on the first assertion regarding motive and intent, but stated, "if the court does[ not] allow that under [Evidence Code section] 352, we still have to prove the predicate offenses in [c]ount 2 and in the special circumstances." The trial court's comments suggest the court agreed with the prosecutor's primary position, that the uncharged offenses were relevant to motive and intent in ruling the evidence was admissible.

Regardless, the evidence of the uncharged offenses was *also* admissible to prove the gang sentencing enhancement and substantive gang crime. (See *Tran, supra,* 51 Cal.4th at pp. 1047–1049 [evidence of prior conviction relevant to prove predicate offenses for active participation in a criminal

_____

12    The other predicate offenses offered by the prosecution were weapons charges; they did not provide evidence of motive and intent.

26

street gang, even where there was evidence of other predicate acts].) Gross asserts the uncharged conduct at issue in *Tran*, a series of extortions, "pale in severity compared to the uncharged murder" at issue here. This argument misses the mark. In deciding whether to admit evidence of uncharged offenses, the trial court in each case must consider the probative value and the prejudicial nature of such evidence in the context of the charged offenses in the case before the court. It is not relevant whether the uncharged offenses are more or less severe than those at issue in another case, involving a different defendant. Moreover, the Court in *Tran* did not rely solely on the severity of the uncharged offenses in reaching its conclusion the evidence was not overly prejudicial; it also considered that "the evidence of defendant's extortion activities was less inflammatory than the testimony about the charged offenses." (See *ibid.* [prejudice is decreased where the evidence of the uncharged offense is no stronger or more inflammatory than the evidence of the charged offense].)

For the reasons stated, we conclude the trial court in this case conducted the appropriate legal analysis required by Evidence Code sections 1101, subdivision (b), and 352. No abuse of discretion appears from the record before us.[13]

## III.

### *There Was No* Brady *Error*

Next, Gross contends the prosecution committed *Brady* error and violated his due process rights by failing to disclose nine different categories of potentially exculpatory evidence. We reject the claim.

---

[13] "Because the court did not abuse its discretion under state law, defendant's constitutional claims also fail." (*Chhoun, supra,* 11 Cal.5th at p. 26.)

To establish a *Brady* violation, Gross must prove: (1) evidence was "suppressed by the State, either willfully or inadvertently"; (2) the evidence was "favorable to the accused, either because it [was] exculpatory, or because it [was] impeaching;" and (3) that prejudice resulted. (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282; *People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).) We review Gross's claim of *Brady* error de novo, giving great weight to any underlying factual findings of the trial court that are supported by substantial evidence. (*Salazar*, at p. 1042.) Here, Gross is unable to prove any evidence was "suppressed by the State, either willfully or inadvertently." (*Strickler,* at p. 282.)

Gross asserts, as he did at trial, that the prosecution failed to turn over the following nine categories of evidence: (1) discovery pertaining to charges of falsifying an unrelated report filed against Detective Kristine Hawk, who was present during Warren's autopsy and wrote a report summarizing the medical examiner's findings; (2) the identity of an anonymous witness who told the police that someone named "C.J." was the shooter; (3) information that individual officers in the Madera Police Department knew that Warren was a drug dealer; (4) background information pertaining to Warren's prior gang involvement and Warren's efforts to turn his life around; (5) a copy of Kelly's third police interview; (6) the photograph of Gross that Kelly received from Warren's brother Dan and whom Dan said was allegedly "bragging" about Warren's murder; (7) ballistics reports that were provided to the defense during trial; (8) DNA test results from a blood sample and swab taken from the inside collar of the "Seaside" sweatshirt that was collected from the crime scene; and (9) discovery pertaining to the gang expert's training and experience.

The prosecution addressed each one of these categories of evidence at trial. As for category one, the prosecutor said he did alert defense counsel there was a potential issue with Detective Hawk when he first turned over the autopsy information. The prosecutor also explained Detective Hawk was not being called as a witness, and Detective Hawk had no relevant information that was different than what the medical examiner would provide at trial. Defense counsel conceded the charges against Detective Hawk had been dismissed. The trial court ordered the prosecution to provide any information it had on the charges filed against Detective Hawk, and later specified that included any associated police reports. The prosecutor complied and provided the relevant police report to defense counsel. The trial court found, "the disclosure has been made as maybe required" and found the People had no "continuing obligation" regarding Detective Hawk.

Category two involved a police report documenting information received from an anonymous source, which was provided to defense counsel. According to the police report, the anonymous source was "not present at the time of the shooting or the fight at the bar," but had family members who were present. The source said the shooter was "a black, male adult who goes by the moniker of 'CJ,' who is also a Project Crip Sonoma Seaside member." Defense counsel asserted the prosecution was obligated to release additional information, including the name of the source. The prosecutor represented he had "no other reports" but made the officer who authored the police report available to the defense for further inquiry. The authoring officer confirmed he did not have any knowledge or recollection regarding the source's identity. Again, the trial court concluded the prosecutor had provided all available information to the defense, and there was "[n]othing else to be discovered."

29

There was also no further information to discover concerning categories three and four regarding Warren's involvement with drug dealing and gang membership. Two police reports provided to the defense suggested Warren was a drug dealer who used to be a member of the Bloods, and the shooting may have been related to a drug rivalry between Warren and Donald "Boo Boo" D. Defense counsel asserted the prosecution had an obligation to provide additional information regarding any information the police had to support those statements. Again, the prosecutor represented there were no other reports and nothing further to turn over. The trial court ordered the prosecution to provide any additional information they had regarding a drug rivalry between Warren and Donald, or any other transgressions committed by Warren, such as "whether he had come afoul of law enforcement . . . or anything related to that." The prosecutor explained they performed "a total, global search" of Warren in the records of the police department and, with the exception of one minor offense for possession of .02 grams of cocaine from 2004, there was nothing else to disclose. At the trial court's suggestion, the prosecutor agreed to make one of the detectives who had suggested Warren was a drug dealer available to the defense to confirm there was no further information available.

Categories five and six—the recording of Kelly's third police interview and the photograph of Gross that Kelly showed the police that same day— were unavailable because the compact disc they had been stored on was corrupted. The prosecutor explained that when the issue had come up over a year earlier, he had inquired with the police department's evidence technician. In an email, which was provided to defense counsel, the technician confirmed their file showed "one of the evidence clerks tried to get [the disc] to work" but it was corrupted and "blank." The detective that

30

conducted Kelly's interview looked for the photograph but could not find it. His "best guess" was that it was on the corrupted disc. At the hearing on the defense's *Brady* motion, outside the presence of the jury, the trial court stated: "[I]t is my understanding that [the photograph] does[ not] exist; not that it never existed, but that it does not currently exist as far as is known to the People. [¶] If it does exist, if the People have any access to that, they must discover that to the Defense under *Brady*. But if it doesn't exist, then it doesn't exist." (Italics added.)

Finally, the prosecutor attested the remaining categories of evidence were provided to the defense. Defense counsel requested a copy of the gang expert's curriculum vitae, and the court said the defense was entitled to a copy. Defense counsel did not raise the issue again and there is no indication the prosecution failed to provide the curriculum vitae. Defense counsel conceded the DNA and ballistics reports were disclosed, although there was a dispute as to *when* defense counsel received them. The trial court found, "with regard to the DNA and the ballistics information contained within the DOJ reports, it[ is] impossible for the [c]ourt to ascertain when [defense counsel] received it . . . but it has been delivered to [defense counsel], and they have the information."[14] As noted, the parties entered a stipulation regarding the DNA and ballistics testing. (See footnote 3, *ante*.)

Relying on *Youngblood v. West Virginia* (2006) 547 U.S. 867, Gross asserts the prosecutor's obligation under *Brady* included the disclosure of

_____

14    Gross does not expressly assert the alleged *delay* in disclosing the reports constituted a *Brady* error. Still, "evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery." (*People v. Morrison* (2004) 34 Cal.4th 698, 715.)

31

evidence in the possession of law enforcement. In *Youngblood*, the Supreme Court explained, "*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.' " (*Id.* at pp. 869–870.) " '[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.' " (*Id.* at p. 870.) But here, the prosecutor did not limit disclosure to the information in his possession. He attempted to obtain all available information from the police, even going so far as arranging for defense counsel to speak with the relevant officers. There was no additional information for the prosecution to provide.

Gross focuses the remainder of his arguments on the materiality of the information and the prejudice resulting from the alleged suppression. He does not directly address the Attorney General's contention the prosecutor turned over all available information. Any arguments regarding the materiality of any additional information—which, as far as we can tell, does not exist—is both speculative and irrelevant. As the trial court noted, "if it doesn't exist, then it doesn't exist." We conclude no *Brady* error occurred.

## IV.

*Impact of Recent Statutory Amendments Implemented By Assembly Bill 333*

Assembly Bill 333 became effective on January 1, 2022, while this appeal was pending. (Stats. 2021, ch. 699, § 3, eff. Jan. 1, 2022.) It amended section 186.22 to impose additional elements necessary to prove the substantive crime of active participation in a criminal street gang in subdivision (a) and the related gang sentencing enhancement allegation in subdivision (b). It also added new section 1109, which requires the trial court to bifurcate substantive charges and enhancement allegations under section

32

186.22, upon the defendant's request.  Gross requested, and we allowed, supplemental briefing regarding the impact of Assembly Bill 333 on this case.

A.    *Amendments to Section 186.22*

The Legislature first enacted section 186.22 as part of the "California Street Terrorism Enforcement and Prevention Act" (the STEP Act) in 1988. (Assem. Bill No. 2013 (1987–1988 Reg. Sess.) Cal. Legis. Serv., ch. 1242; § 186.20 et seq.)  The purpose of the STEP Act was to "make the commission of criminal offenses by individuals who are members of street gangs a separate and distinctly punished offense."  (*Ibid*., emphasis omitted.) Relevant here, subdivision (a) of section 186.22 makes active participation in a criminal street gang a substantive crime and subdivision (b) sets forth various sentencing enhancements for persons convicted of felonies committed for the benefit of, at the direction of, or in association with a criminal street gang.  Assembly Bill 333 made several important changes to section 186.22.

First, Assembly Bill 333 amended the statutory definition of what constitutes a " 'pattern of criminal gang activity,' " under section 186.22, subdivision (e).  Former section 186.22, subdivision (e), defined " 'pattern of criminal gang activity' [as] the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [33 enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." Following Assembly Bill 333, the definition now requires that "the last of those offenses occurred within three years of the prior offense *and* within three years of the date the current offense is alleged to have been committed." (§ 186.22, subd. (e)(1), italics added.)  The definition also now requires that

33

"the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational."[15] (*Ibid.*)

Second, Assembly Bill 333 added subdivision (e)(2), which provides, "[t]he currently charged offense shall not be used to establish the pattern of criminal gang activity." (§ 186.22, subd. (e)(2).)

Third, Assembly Bill 333 amended section 186.22, subdivision (f) (section 186.22(f)). Section 186.22(f) previously defined " 'criminal street gang' [as] any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e), having a common name or common identifying sign or symbol, and whose members *individually* or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) The definition now requires "an ongoing, organized association, or group of three or more persons." (§ 186.22, subd. (f).) The word "individually" was removed, now requiring the members to "*collectively* engage" in a pattern of criminal gang activity. (*Ibid.*, italics added.)

Finally, Assembly Bill 333 added section 186.22, subdivision (g), which provides: "As used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or

_____

[15]    The amendments also removed four categories of enumerated offenses that would qualify as a predicate act, none of which are relevant to this case.

34

intimidation or silencing of a potential current or previous witness or informant."

B.    *The Amendments to Section 186.22 Apply Retroactively to Gross*

The Attorney General concedes the amendments to section 186.22 apply retroactively to Gross, and require that we vacate his conviction under section 186.22, subdivision (a), in count 2 and the true finding on the sentence enhancement allegation under subdivision (b)(5).  We agree.

Under the *Estrada* rule, we presume, absent evidence to the contrary, that statutes that reduce punishment for criminal conduct apply retroactively to all defendants whose sentences are not final on the statute's operative date.  (See *People v. Frahs* (2020) 9 Cal.5th 618, 620–626; *People v. Brown* (2012) 54 Cal.4th 314, 323; *Estrada, supra*, 63 Cal.2d at pp. 742–745.)  As our high court has recently held, by increasing the threshold requirements of a conviction on the active gang participation offense and the gang enhancement allegation pursuant to section 186.22, subdivisions (a) and (b)(5), respectively, Assembly Bill 333 is ameliorative on some sentences, and is therefore retroactive under the *Estrada* rule.  (See *People v. Tran* (Aug. 29, 2022, S165998) ___ Cal.5th ___ [p. 40]; accord *People v. Lopez* (2021) 73 Cal.App.5th 327, 344 (*Lopez*) [concluding the amendments to section 186.22 implemented by Assembly Bill 333 are retroactive because they "increase[ ] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement"]; *People v. Lee* (2022) 81 Cal.App.5th 232, 237 (*Lee*) [following *Lopez*]; *People v. Montano* (2022) 80 Cal.App.5th 82, 89 (*Montano*) [same]; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822–823 [same]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1126–1127 [same].)

Gross was charged in count 2 with the substantive crime of active participation in a criminal street gang, pursuant to section 186.22,

subdivision (a), and the People alleged the murder in count 1 was carried out to further the activities of the criminal street gang, pursuant to section 186.22, subdivision (b)(5). The prosecution introduced evidence of two predicate acts to prove count 2 and the gang enhancement: (1) a conviction of Everett Mitchell for carrying a concealed weapon in a vehicle in violation of former section 12025, subdivision (a)(1), committed on or about January 8, 2010; and (2) a conviction of Michael Cortez for carrying a loaded firearm in public in violation of former section 12031, subdivision (a)(1), committed on or about May 19, 2011.[16]

Obviously, the prosecution was not required to prove the additional elements later implemented by the statutory amendments under Assembly Bill 333. The trial court instructed the jury pursuant to the former requirements of section 186.22, telling them they could consider the current charged offense of Warren's murder as a qualifying predicate act in determining whether the prosecution proved a "pattern of criminal gang activity." In addition, the prosecutor told the jury, during closing arguments, "if you believe beyond a reasonable doubt that the defendant committed this crime [(the murder of Warren)], you can use that as one of those pattern offenses." Further, as the Attorney General concedes, the jury was not told the predicate offenses had to benefit the gang in a way that was more than reputational, or that the predicate offenses had to be "committed by two or more gang 'members[,]' as opposed to 'two or more persons.' " (§ 186.22, subds. (e)(1), (g).)

---

16    Sections 12023 through 12031.1 were repealed in 2012 and replaced, without substantive change, by separate sections of the Penal Code. (See Stats. 2010, ch. 711 (Sen. Bill No. 1080) § 4.)

Consequently, Gross's conviction on count 2 for active participation in a gang pursuant to section 186.22, subdivision (a), and the true finding on the gang enhancement pursuant to section 186.22, subdivision (b)(5), must be reversed. (See, e.g., *People v. Tran, supra,* ___ Cal.5th ___ [at p. 42] [concluding "reversal of the gang enhancement is required" where "the jury was not presented with any discernible theory as to how [gang] members 'collectively engage[d] in' these predicate crimes" as required by amended section 186.22(f)]; *Lopez, supra,* 73 Cal.App.5th at p. 346 [concluding a gang-related enhancement finding prior to Assem. Bill 333 must be vacated because the People were not required to prove the predicate offenses commonly benefitted a criminal street gang or that the benefit was more than reputational]; *Ramos, supra,* 77 Cal.App.5th at p. 1128 [reversal of the gang enhancement was required because "neither party argues, nor can [the court] conclude, the evidence presented at trial was sufficient to sustain the gang enhancement under the revised requirements of section 186.22"].) On remand, the People shall be afforded the opportunity to retry Gross pursuant to section 186.22, subdivisions (a) and (b)(5), as amended by Assembly Bill 333. (See *Lopez,* at p. 346; see also *People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element[s] upon remand. [Citation.] Such a retrial is not barred by the double jeopardy clause or ex post facto principles because the [additional elements were] not relevant to the charges at the time of trial and accordingly, [the issue] was never tried."].)

C.  *Incorporation of Assembly Bill 333's Amendments to Section 186.22 into the Gang-Murder Special Circumstance Under Section 190.2, Subdivision (a)(22), Does Not Unconstitutionally Amend Proposition 21*

The jury's true finding on the gang-murder special circumstance pursuant to section 190.2, subdivision (a)(22) (section 190.2(a)(22)) is also implicated by Assembly Bill 333's recent amendments to section 186.22. Section 190.2(a)(22) expressly incorporates the statutory definition of what constitutes a "criminal street gang" as set forth in section 186.22(f). Section 190.2(a)(22) provides a defendant shall be subject to death or a term of life without the possibility of parole if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, *as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang." (Italics added.)

Subdivision (a)(22) was added to section 190.2 in 2000, as part of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998. (*People v. Shabazz* (2006) 38 Cal.4th 55, 65 (*Shabazz*).) Subdivision (c) of article II, section 10 of the California Constitution restricts the Legislature from amending "an initiative statute by another statute" unless the subsequent statute is "approved by the electors" *or* "the initiative statute permits amendment . . . without the electors' approval." There is no dispute Assembly Bill 333 did not meet this criterion. (See *Lee, supra,* 81 Cal.App.5th at p. 240; *People v. Lopez* (2022) 82 Cal.App.5th 1, 18.) Thus, the Attorney General asserts, Assembly Bill 333's amendments to section 186.22 constitute an unconstitutional amendment to a voter initiative if applied to section 190.2(a)(22).

On this question, two courts have recently reached different conclusions. In *People v. Rojas* (2022) 80 Cal.App.5th 542, a divided panel in

38

the Fifth Appellate District agreed with the Attorney General and held, "allowing Assembly Bill 333's changes to section 186.22 to affect section [190.2(a)(22)] would constitute an impermissible amendment of Proposition 21." (*Id*. at p. 547 (maj. opn. of Poochigian, J.); see *id*. at pp. 558–561 (conc. & dis. opn. of Snauffer, J.).) But, more recently, the Second Appellate District in *Lee* held Assembly Bill 333 did *not* unconstitutionally amend section 190.2(a)(22) because it neither prohibited what Proposition 21 authorized, nor authorized what Proposition 21 prohibited. (*Lee, supra,* 81 Cal.App.5th at p. 245.) We agree with the *Lee* decision, and likewise conclude the amendments to section 186.22 apply to the gang-murder special circumstance under section 190.22(a)(22) and do not constitute an unconstitutional amendment of Proposition 21.

As our high court has explained, "[i]n deciding whether [a] particular [statutory] provision amends [a voter initiative], we simply need to ask whether it prohibits what the initiative authorizes, or authorizes what the initiative prohibits." (*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571 (*Pearson*).) What the voters intended to authorize or prohibit by the initiative "is a question of statutory interpretation. When we interpret an initiative, we apply the same principles governing statutory construction. We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent

39

and understanding of a ballot measure." (*Ibid.*) In short, "[t]he voters should get what they enacted, not more and not less." (*Ibid.*)

Here, we need not begin anew. The California Supreme Court has "had occasion in past decisions to review at length the findings and declarations that were set forth as part of [Proposition 21]." (*Shabazz, supra,* 38 Cal.4th at p. 65.) As the Court explained, "[t]he voters intended to address gang-related crime generally," and, as relevant here, " 'to punish all gang crime more severely.' " (*Ibid.*, quoting *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 905–908 (*Robert L.*).) The ballot measure announced: " 'Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties.' " (*Shabazz,* at p. 65, quoting Ballot Pamp., Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 2, subd. (h), p. 119 (Ballot Pamphlet).) The ballot measure further stated "[l]ife without the possibility of parole or death should be available to murderers who kill as part of any gang-related activity." (Ballot Pamphlet, text of Prop. 21, p. 119, italics omitted.) To achieve that goal, voters amended section 186.22 to *increase the sentences* for the gang enhancements set forth in subdivisions (b), (c), and (d), and amended existing section 190.2 to add subdivision (a)(22)—at issue here—to include gang-related murder in the list of special circumstances allowing the imposition of death or life without the possibility of parole. (See Ballot Pamphlet, text of Prop 21, pp. 119, 120, 122; *Lee, supra,* 81 Cal.App.5th at pp. 242–244.)

In doing so, the voters intended to address serious gang-related crimes, including murder. In the arguments in favor of Proposition 21, the ballot pamphlet explains: *"Proposition 21 doesn't incarcerate kids for minor offenses—it protects Californians from violent criminals who have no respect for human life.* [¶] Ask yourself, if a violent gang member believes the worst

40

punishment he might receive for a gang-ordered murder is incarceration at the California Youth Authority until age 25, will that stop him from taking a life? Of course not, and THAT'S WHY CALIFORNIA POLICE OFFICERS AND PROSECUTORS OVERWHELMINGLY ENDORSE PROPOSITION 21. [¶] Proposition 21 ends the 'slap on the wrist' of current law by imposing real consequences for GANG MEMBERS, RAPISTS AND MURDERERS who cannot be reached through prevention or education." (Ballot Pamphlet, *supra,* argument in favor of Prop. 21, p. 48.) In the arguments against Proposition 21, opponents noted California already has tough laws against gangs and "tools . . . to prosecute and punish gang members who commit violent crimes." (*Id.*, argument against Prop. 21, p. 49.) Notably, as we later discuss in more detail, the voters did not alter the scope of the then-existing gang-crime related laws, and changed only the related punishments.

The amendments to section 186.22 implemented by Assembly Bill 333 are not in conflict with the voters' intent in enacting Proposition 21. In enacting Assembly Bill 333, the Legislature explained proponents of the STEP Act "claimed the prosecution would be unable to prove an offense was committed for the benefit of, or in association with, a gang 'except in the most egregious cases where a pattern of criminal gang activity was clearly shown.' " (Stats 2021, ch. 699, § 2, subd. (e).) The Legislature determined, however, the STEP Act was "continuously expanded through legislative amendments and court rulings," leading to "ubiquitous" application. (*Ibid.*) The Legislature thus expressed concern that former section 186.22 was, at times, misapplied to "social networks of residents in neighborhoods." (Stats. 2021, ch. 699, § 2, subd. (d)(8).) The Legislature also found "[c]urrent gang enhancement statutes criminalize entire neighborhoods historically impacted by poverty, racial inequality, and mass incarceration as they punish people

41

based on their cultural identity, who they know, and where they live," in part because "[t]he social networks of residents in neighborhoods targeted for gang suppression are often mischaracterized as gangs." (*Id*. at subds. (a), (d)(8); see also *id*. at subd. (d)(7) ["People frequently receive gang enhancements based on the conduct of other people whom they have never even met."].)

Assembly Bill 333's amendments to section 186.22 reverse that course. The additional requirements set forth in amended section 186.22 ensure the enhancements are applied to crimes that are truly related to patterns of criminal gang activity, as opposed to individual crimes committed by persons merely associated with "social networks of residents in neighborhoods." (Stats. 2021, ch. 699, § 2, subd. (d)(8).) The amendments do not change the length of the sentences imposed, nor do they remove gang-related murder from the list of special circumstances making a qualifying defendant eligible for death or life without the possibility of parole. They simply ensure the increased punishments provided in sections 186.22 and 190.2(a)(22) are applied to the type of criminal conduct the voter's intended to address in Proposition 21; that is, crimes that are directly related to criminal street gangs and gang activity. In doing so, Assembly Bill 333's amendments do not prohibit what Proposition 21 authorized (longer sentences for gang-related crimes), or authorize anything that Proposition 21 prohibited. (See *Pearson, supra,* 48 Cal.4th at p. 571.) Accordingly, Assembly Bill 333 does not unconstitutionally amend Proposition 21. (*Ibid.*)

The Attorney General concedes the amendments implemented by Assembly Bill 333 did not directly alter the language of section 190.2(a)(22). As in *Lee,* the Attorney General relies on a general principal of statutory construction announced in *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53 (*Palermo*): " '[W]here a statute adopts by specific reference the

provisions of another statute . . . such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified.' " (*Id.* at pp. 58–59; see *Lee, supra,* 81 Cal.App.5th at pp. 240–241 [quoting *Palermo*]; see also *In re Oluwa* (1989) 207 Cal.App.3d 439, 445 [applying *Palermo* in the context of a statutory amendment to a voter initiative].)  Based on this general rule, known as the *Palermo* rule, the Attorney General argues, by incorporating the definition of "criminal street gang" from section 186.22(f) into section 190.2(a)(22), the voters must have intended to adopt the definition in the form that existed when Proposition 21 passed in 2000.  We are not persuaded.

The *Palermo* rule is but one rule among many.  Like all rules of statutory construction, it should not be applied mechanically, rigidly, or in isolation.  (See *In re Jovan B.* (1993) 6 Cal.4th 801, 816, fn. 10 ["Several modern decisions have applied the *Palermo* rule, but none have done so without regard to other indicia of legislative intent."]; *Lee, supra,* 81 Cal.App.5th at p. 241 [*Palermo* rule is not mechanically applied]; *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1505 ["the *Palermo* rule is not to be applied in a vacuum"]; see also *People v. Cornett* (2012) 53 Cal.4th 1261, 1271 [" ' "[A] rule of construction . . . is not a straitjacket." ' "]; *Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 432 ["Rules of statutory construction are not to be rigidly applied in isolation."].)  Notably, the California Supreme Court in *Palermo* also set forth a cognate rule:  " '[W]here the reference is general instead of specific, such as a reference to a system or body of laws or to the general law relating to the subject in hand, the referring statute takes the law or laws referred to not only in their contemporary form, but also as they may be changed from time to time.' " (*Palermo, supra,* 32 Cal.2d at p. 59.)  As our high court has explained on more than one occasion since,

"when the statutory words themselves 'do not make clear whether [the statute] contemplates only a time-specific incorporation, "the determining factor will be . . . legislative intent." ' " (*People v. Anderson* (2002) 28 Cal.4th 767, 779; see also *Jovan B.,* at p. 816 [same].)

Here, the words of section 190.2(a)(22) do not make clear whether the voters intended only a time-specific incorporation. *Doe v. Saenz* (2006) 140 Cal.App.4th 960 is instructive. The *Saenz* court considered the impact of the *Palermo* rule on a statute specifying a criminal records exemption could not be granted for persons convicted of certain designated crimes, including any " 'conviction of [a] crime against an individual *specified in subdivision (c) of section 667.5 of the Penal Code.*' " (*Saenz,* at p. 982, original italics omitted, our italics added.) The court explained the statutory language at issue in *Palermo* authorized certain leases with Japanese nationals made in accordance with " 'any treaty *now existing*' between the United States and Japan." (*Saenz,* at p. 981, italics added.) By using the words " '*now existing*,' " "the incorporating statute referred to the treaty as it existed when the incorporating statute was passed." (*Ibid.*, italics added.) Although the statute at issue in *Saenz* expressly incorporated a specific subdivision of a specific statute, the court concluded the statutory language did not directly state the incorporation was *time-specific* as the statute in *Palermo* had done. (*Saenz,* at p. 981.) So the court would need to "examine evidence of legislative intent concerning whether the reference is specific or general." (*Ibid.*) Likewise, here, the express language of section 190.2(a)(22) does not incorporate the definition from section 186.22(f) in a *time-specific* manner.

We look to indicia of the voters' intent in enacting Proposition 21. Doing so, we reach the same conclusion as the court in *Lee,* "the voters did not contemplate a time-specific incorporation of the then-current version of

44

section 186.22, subdivision (f), into the gang-murder special circumstance statute." (*Lee, supra,* 81 Cal.App.5th at p. 241.)  By enacting Proposition 21, the voters intended to *increase sentences for all gang-related crimes*, including murder.  In that context, the incorporation of the definition of a " 'criminal street gang' " from section 186.22(f) into new section 190.2(a)(22) indicates an intent by the voters to *conform* the requirements of section 186.22 and section 190.2(a)(22), the two gang-related statutory sentencing provisions addressed by Proposition 21.  (See *Lee,* at p. 245.)  But, as the Attorney General implicitly concedes, the voters left the definitions in section 186.22 open to further amendment by the Legislature.  (See *Lee,* at p. 242.)

As noted, in enacting Proposition 21 the voters also amended portions of section 186.22 to increase the sentences associated with the gang crime-related enhancements.  (See Ballot Pamphlet, *supra*, text of Prop. 21, pp. 119–120.)  "When an existing statutory section is amended—even in the tiniest part—the state Constitution requires the entire section to be reenacted as amended." (*County of San Diego v. Commission on State Mandates* (2018) 6 Cal.5th 196, 208.)  "The rationale for compelling reenactment of an entire statutory section when only a part is being amended is to avoid . . . the risk that ' "the public, from the difficulty of making the necessary examination and comparison, failed to become [apprised] of the changes made in the laws." ' " (*Ibid.*)  But "[w]hen technical reenactments are required under article IV, section 9 of the Constitution—yet involve no substantive change in a given statutory provision—the Legislature in most cases retains the power to amend the restated provision through the ordinary legislative process.  This conclusion applies *unless* the provision is integral to accomplishing the electorate's goals in enacting the initiative or other indicia support the conclusion that voters reasonably intended to limit the

45

Legislature's ability to amend that part of the statute." (*Id*. at p. 214; see also Gov. Code, § 9605, subd. (a) ["If a section or part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form. The portions that are not altered are to be considered as having been the law from the time when those provisions were enacted; the new provisions are to be considered as having been enacted at the time of the amendment; and the omitted portions are to be considered as having been repealed at the time of the amendment."].)[17]

The only changes the voters made to section 186.22, subdivisions (e) and (f), in Proposition 21 was to expand the list of offenses that qualified as predicate offenses and to add "conspiracy to commit" to subdivision (e). (Ballot Pamphlet, *supra*, text of Prop. 21, p. 120.) The voters did not otherwise alter the language of the relevant definitions in either subdivision. (*Ibid*.; *People v. Lopez, supra,* 82 Cal.App.5th at p. 19 ["Proposition 21 reenacted [186.22, subdivision (e)] without substantive change to the first paragraph of the prior version except for adding the words, 'conspiracy to commit.' "].) Further, there is nothing in Proposition 21, or the Ballot Pamphlet to suggest the voters intended to limit the Legislature's ability to amend the statutory definitions set forth in section 186.22, subdivisions (e) or (f), going forward. Rather, "the voters left intact the Legislature's power to amend the definition(s)." (*Lee, supra*, 81 Cal.App.5th at p. 242.) By acknowledging the newly amended definitions apply retroactively to section 186.22, the Attorney General implicitly concedes Proposition 21 did not

---

17    Government Code section 9605, subdivision (a) was recently amended by Senate Bill No. 1380 (2021–2022 Reg. Sess.). (Stats. 2022, ch. 28, § 59.) The changes, which will be effective January 1, 2023, do not impact our analysis.

preclude the Legislature from making those amendments. Yet, the Attorney General asks us to infer the voters intended to freeze the *very same* definitions by incorporating section 186.22(f) into section 190.2(a)(22). We perceive no such intent.

As the court in *Lee* explained, "the electorate clearly knew how to express the intent to freeze a statutory definition." (*Lee, supra,* 81 Cal.App.5th at p. 243.) In two other places, Proposition 21 expressly stated references to existing statutes were " 'to those statutes *as they existed on the effective date of this act, including amendments made to those statutes by this act.*' " (*Ibid*.; see also Ballot Pamphlet, *supra*, text of Prop. 21, §§ 14, 16, pp. 123–124.) Notably, though, newly added section 190.2(a)(22) does not similarly incorporate the definition of criminal street gang *as it existed on the effective date of this act*. Nor does it include any other time-specific limitation on the incorporation of the statutory definition. "It is not our role to rewrite the initiative by inserting language the drafters never included and the voters never considered." (*People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270, 284 (*Gooden*).)

Rather, in our view, the ballot materials evidence an intent by the voters to *conform*, at all times, the statutory definitions of gang-related crimes across section 186.22 and section 190.2(a)(22). The Ballot Pamphlet for Proposition 21 states, "[c]urrent law generally defines 'gangs' as any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of certain crimes." (Ballot Pamphlet, *supra*, analysis of Prop. 21 by Legis. Analyst, p. 46; see also *Robert L. supra,* 30 Cal.4th at p. 906 ["As with ballot pamphlet arguments, a reviewing court may look to a ballot's legislative analysis to determine voter intent."].) It then uses the general term "gang-

47

related" in several places to refer to both the increased sentence enhancements and the gang-murder special circumstance. (Ballot Pamphlet, at pp. 44, 46, 47.) It explains, "[t]his measure increases the extra prison terms for *gang-related* crimes . . . [and] adds *gang-related* murder to the list of 'special circumstances' that make offenders eligible for the death penalty." (*Id*. at p. 46, italics added.) It also contains a summary chart of the gang provisions, and states the act "[i]ncreases penalties for *gang-related crimes*," without distinguishing between the felony sentencing enhancements and the newly added gang-murder special circumstance. (*Id*. at p. 47, some italics omitted.)

Further, the proposed text of Proposition 21 states: "Gang-related felonies should result in severe penalties. Life without the possibility of parole or death should be available for murderers who kill as part of any gang-related activity." (Ballot Pamphlet, *supra*, text of Prop. 21, p. 119.) It also explicitly states the intent of the amendment to section 190.2 was "to add intentional *gang-related* murders to the list of special circumstances." (Ballot Pamphlet, at p. 131, italics added.) Nowhere does it differentiate between the meaning of "gang-related" as it is used to modify murder or any other felony, to which a section 186.22 enhancement may apply. Thus, the most obvious inference from the incorporation of the statutory definition in section 186.22(f) into section 190.2(a)(22) is that the voters intended for "gang-related" to have the same meaning in both statutes. We conclude, as the court did in *Lee*, "the term 'criminal street gang' as incorporated in the gang-murder special circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (See *Lee, supra,* 81 Cal.App.5th at p. 245.)

Our conclusion also finds support in another well-settled rule of statutory construction, which requires us to construe Proposition 21 " ' "to promote its purpose, render it reasonable, and avoid absurd consequences." ' " (*People v. Taylor* (2021) 60 Cal.App.5th 115, 131.)  As our high court has explained, in enacting Proposition 21, "[t]he voters intended to address gang-related crime generally," and " 'to punish all gang crime more severely.' " (*Shabazz, supra,* 38 Cal.4th at p. 65, quoting *Robert L., supra,* 30 Cal.4th at pp. 905–908.)  Construing section 190.2(a)(22) to incorporate the statutory definition in section 186.22(f) as it was in 2000, while simultaneously allowing the Legislature to amend that *same definition* in the context of the penalties for gang-related felonies set forth in section 186.22, would lead to absurd, and unjust, consequences.  In a case such as this, where a defendant stands accused of a gang-related murder, the defendant "could be found not to qualify for the lesser gang sentence enhancements, but nonetheless found to qualify for capital punishment." (*Lee*, *supra,* 81 Cal.App.5th at p. 242, fn. 36.)  That surely cannot be the result the voters intended.

The Attorney General acknowledges this court reached a similar conclusion in *Gooden*.  There, we considered whether the statutory amendments implemented by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437)—which "prospectively amended the mens rea requirements for the offense of murder and restricted the circumstances under which a person can be liable for murder under the felony-murder rule or the natural and probable consequences doctrine"—unconstitutionally amended Propositions 7 or 115—which "increased the punishments for murder and augmented the list of predicate offenses for first degree felony-murder liability, respectively." (*Gooden, supra,* 42 Cal.App.5th at pp. 274, 288–289.)  We concluded Senate Bill 1437 was not an unconstitutional

49

amendment of either proposition, primarily because the propositions addressed the punishment for murder, while the amendments addressed the distinct topic of the elements of the crime.  Thus, the amendments neither added to, nor took away from, the initiatives.  (*Id*. at p. 281.)  In reaching that conclusion, we rejected an assertion that the *Palermo* rule should apply to Proposition 7 based on, what the court determined was a *general* reference, to " 'murder in the first degree' and murder in the second-degree. " (*Id*. at pp. 282–283.)

The Attorney General argues there are two key differences between this case and *Gooden*.  First, the Attorney General asserts Senate Bill 1437 amended sections 188 and 189, but Proposition 7 amended only section 190.2, and did not specifically incorporate sections 188 or 189 by reference.  As we have already explained, the incorporation of section 186.22(f) by reference into section 190.2(a)(22) is not, on its own, sufficient to implicate the *Palermo* rule.  To the contrary, there is no indication the voters intended the incorporation to be *time-specific* or, in other words, to refer to the incorporated definition only as it stood in 2000.  Second, the Attorney General asserts Proposition 21 did not just change the penalty for gang-related crimes.  Rather, "it *created* the special circumstance provision where none had previously existed."  In our view, this is a distinction without a difference.  In enacting Proposition 21, the voters did not create special circumstance murder.  As the Ballot Pamphlet explains, the voters "*add[ed]* gang-related murder to the list of 'special circumstances' that make offenders eligible for the death penalty."  (Ballot Pamphlet, *supra*, analysis of Prop. 21 by Legis. Analyst, p. 46, italics added.)  The voters' intent in doing so was to increase the penalties for gang-related crimes, including murder.  That intent is not undermined by ensuring the increased penalties of death and life

50

without the possibility of parole are imposed on persons that commit a true gang-related murder. (See *Gooden, supra,* 42 Cal.App.5th at p. 288.)

In sum, "[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) Here, the intent of the voters in passing Proposition 21 was to increase penalties for gang-related felonies and murders. By enacting Assembly Bill 333, the Legislature sought to focus those increased penalties on crimes that are truly related to patterns of criminal gang activity, the type that likely animated voters to enact Proposition 21 in the first instance. (See, e.g., Ballot Pamphlet, *supra,* argument in favor of Prop. 21, p. 48 [discussing "gang-ordered murder" and other violent gang-related crimes].) Construing section 190.2(a)(22) in a manner that allows the incorporated statutory definition of criminal gang activity to evolve concurrently with section 186.22 achieves the goals of both the voters and the Legislature. We therefore conclude Assembly Bill 333 does not unconstitutionally amend section 190.2(a)(22).

Here, the trial court instructed the jury on the gang-murder special circumstance under section 190.2(a)(22) consistent with its instruction on the active gang participation crime and the gang enhancement under section 186.22, subdivisions (a) and (b)(5), respectively. The court's instruction on the gang-murder special circumstance likewise did not incorporate the additional threshold requirements for a conviction now required by amended section 186.22 under Assembly Bill 333. Consequently, we will also vacate the special circumstance finding pursuant to section 190.2(a)(22). On remand, the People shall be afforded the opportunity to retry Gross on that allegation as well, incorporating the statutory definitions in section 186.22,

51

as amended by Assembly Bill 333.  (See *Lee, supra,* 81 Cal.App.5th at p. 245 [vacating the gang-murder special circumstance finding under section 190.2(a)(22) and remanding to afford the People the opportunity to retry the allegation].)

D.     *New Section 1109 Is Not Retroactive*

Assembly Bill 333 also added new section 1109.  It provides, in relevant part, "[i]f requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases[.]"  (§ 1109, subd. (a).)  The question of the defendant's guilt of the underlying offense shall be determined first and, if the defendant is found guilty, "there shall be further proceedings to the trier of fact on the question of the truth of [any] enhancement" under section 186.22, subdivision (b) or (d).  (§ 1109, subds. (a)(1) and (2).)  If the defendant is charged with a separate, substantive offense pursuant to section 186.22, subdivision (a), that charge shall also be tried separately from all other counts, and may be tried along with the related enhancements.  (§ 1109, subd. (b).)

Gross asserts section 1109 also applies retroactively under *Estrada*, and argues he is entitled to an entirely new, bifurcated trial as a result.  As the parties acknowledge, there is currently a split in the appellate courts as to whether section 1109 applies retroactively.  The majority in *People v. Burgos* (2022) 77 Cal.App.5th 550 (*Burgos*) held defendants whose sentences are not yet final are entitled to the retroactive benefit of section 1109 under the *Estrada* rule.  (*Burgos,* at pp. 564–568, review granted July 13, 2022, S274743.)  The majority in *Burgos* reasoned, "the Legislature made no statements in Assembly Bill 333 indicating prospective-only application" of section 1109, and "the bifurcation of gang enhancements at trial is intended to ameliorate the prejudicial impact of trying enhancements together with

52

the offense." (*Burgos*, at pp. 565–566; accord *Ramos*, *supra,* 77 Cal.App.5th at pp. 1128–1132, review denied July 27, 2022, S274781 [concluding section1109 applies retroactively but finding no prejudice from the failure to bifurcate].)

Other courts have since disagreed with the majority in *Burgos* and concluded the *Estrada* rule does not apply to the type of procedural rule set forth in section 1109. (See *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 (*Ramirez*); *People v. Perez* (2022) 78 Cal.App.5th 192, 207.) We need not repeat the analysis here. Suffice to say, we agree the *Estrada* presumption does not apply because section 1109 is a procedural rule that " 'does not create the possibility of lesser punishment or any other "ameliorative" benefit.' " (*Ramirez*, at p. 65; see also *Perez,* at p. 207 ["Although section 1109 is designed to minimize the prejudicial impact of gang evidence, it does not reduce the punishment or narrow the scope of the application of the gang statute."].) We likewise conclude "section 1109 operates prospectively only," and does not provide an independent ground for reversal of Gross's convictions.[18] (*Ramirez,* at p. 65; accord *Perez,* at p. 207 [concluding section 1109 "does not apply retroactively to a trial that has already occurred"].)

But even if we were to assume section 1109 applies retroactively, we conclude Gross was not prejudiced by the failure to bifurcate the gang enhancement or the substantive gang crime. (See *Ramos, supra,* 77 Cal.App.5th at pp. 1131–1133 [finding the defendant "was not prejudiced by the failure to bifurcate the gang enhancement allegation"].) Here, too, our

---

18    The California Supreme Court recently acknowledged this split in *People v. Tran*, *supra*, ___ Cal.5th ___, but expressly declined to reach the issue, deciding instead that any asserted error in the failure to bifurcate was harmless. (See *id.* [at pp. 42–43.])

sister courts have disagreed.  The majority in *Burgos* concluded the failure to bifurcate "likely constitutes 'structural error' [requiring reversal per se] because it 'def[ies] analysis by harmless-error standards.' " (*Burgos, supra,* 77 Cal.App.5th at p. 568.)  Several other courts have concluded the error is not structural, that it is amenable to a harmless error analysis, and the state-law standard of prejudice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) applies.  (See, e.g., *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [applying the *Watson* standard]; *Ramos, supra,* 77 Cal.App.5th at p. 1133 [same]; *Ramirez, supra,* 79 Cal.App.5th at p. 71 (conc. opn. Wilson, J.) [discussing the split and concluding, "because the admission of prejudicial evidence typically constitutes trial error, a reviewing court can evaluate the extent of the prejudice"].)

Our high court has now rejected the "contention that the failure to bifurcate constitutes structural error." (*People v. Tran, supra,* \_\_\_ Cal.5th \_\_\_ [at p. 43].)  The Court also rejected the defendant's argument, in that case, "that the *Chapman v. California* (1967) 386 U.S. 18 [(*Chapman*)] standard for federal constitutional error should apply when reviewing his guilty verdicts." (*Id.* at p. 44.)  The Court explained, " '[t]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.' " (*Ibid.*, original italics.)  The prosecutor there had relied primarily on the testimony of a few key witnesses to establish the defendant's guilt, and had used the gang evidence to strengthen the case for guilt in only two specific ways. (*Id.* [at pp. 44–45].)  The Court concluded neither of those uses of the gang evidence was fundamentally unfair. (*Ibid.*)  Accordingly, the Court applied the *Watson* standard for state-law error. (*Id.* [at p. 45].)

54

Here, we would not find prejudice under either the *Watson* or *Chapman* standard. As we have discussed, the primary fact issue at trial was the identity of the shooter. There were three separate eyewitnesses (Kelly, Krystian, and Preston) who independently identified Gross as Warren's shooter. Kelly was the victim's fiancée and did not know Gross before the shooting, but Krystian and Preston knew Gross well since both were affiliated with Gross's gang. Despite divergent loyalties, the three witnesses' stories were largely similar, and each corroborated the other.

Further, much of the gang-related evidence would have been admissible even if the trial were bifurcated. The prosecution's main theory of the case rested on Gross's motive and intent to defend the reputation of the Seaside Crips. The trial court allowed the prosecutor to introduce gang evidence, including evidence of three other gang-related shootings, primarily to prove motive and intent. That same evidence would have been relevant and admissible even in the absence of the active gang participation offense in count 2 and the gang enhancement. (See *Ramos, supra,* 77 Cal.App.5th at p. 1132 [gang evidence relative to motive, including "gang membership and the gang rivalry" would have been admissible to prove non-gang offenses even if the gang-related charges were bifurcated].) Any additional evidence, including the two additional predicate offenses involving the mere unlawful possession of firearms, was no more inflammatory or prejudicial than the uncharged offense of gang-related shootings.

Further still, the evidence also would have come in under the section 190.2(a)(22) special circumstance. As the court in *Montano* recently explained: "Section 1109 says nothing about the special circumstance statutes, and its provisions are specific to section 186.22, subdivisions (a), (b), and (d). Moreover, the procedures required by section 1109 conflict with the

55

procedures set forth in section 190.1 et seq." (*Montano, supra,* 80 Cal.App.5th at p. 109; see § 190.4, subd. (a) ["Whenever special circumstances . . . are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. [¶] . . . [¶] If the trier of fact finds that any one or more of the special circumstances . . . as charged is true, there shall be a separate penalty hearing[.]"].) Thus, "section 1109, as originally enacted by Assembly Bill 333, does not apply to the determination of special circumstance allegations under section 190.2(a)(22)." (*Montano,* at p. 114.) Here, all of the gang evidence applicable to the substantive gang crime charged in count 2 and the gang sentencing enhancement, pursuant to section 186.22, subdivisions (a) and (b)(5), respectively, was also relevant and admissible under section 190.2(a)(22).

We conclude new section 1109 does not apply retroactively and, even if it did, any error to bifurcate the trial in this case was harmless, under either the *Watson* or *Chapman* standard.

V.

*Section 1385, as Amended by Senate Bill 81, Shall Apply on Remand*

Senate Bill 81 also became effective while the present appeal was pending. The statutory amendments implemented by Senate Bill 81 now require the trial court to consider specific enumerated mitigating factors in exercising its discretion to strike or dismiss a sentencing enhancement. (Stats. 2021, ch. 721, § 1.)

Before Senate Bill 81, section 1385 permitted a trial court to strike or dismiss a sentencing enhancement, and the additional punishment for that enhancement, in the furtherance of justice. (§ 1385, subds. (a), (b).) Newly added subdivision (c) provides, in relevant part: "(1) Notwithstanding any

56

other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c); see also Sen. Bill 81, ch. 721, § 1, pp. 1–3.) New section 1385, subdivision (c)(7), further provides, "[t]his subdivision shall apply to sentencings occurring after the effective date of the act that added this subdivision."

Gross asserts the amendments apply retroactively under the *Estrada* rule, and he is therefore entitled to resentencing under the new section 1385, subdivision (c). (See *Estrada, supra,* 63 Cal.2d at pp. 745–746.) The Attorney General disagrees and asserts the amendment applies prospectively only, based on the express language of section 1385, subdivision (c)(7). Because we are already remanding the matter, we need not resolve this dispute. As the Attorney General also concedes, resentencing on remand will necessarily occur after the effective date of January 1, 2022. Accordingly, Gross will be entitled to the benefit of the statutory amendments to section 1385 implemented by Senate Bill 81.

## DISPOSITION

The conviction pursuant to section 186.22, subdivision (a), (count 2) and the true findings on the gang enhancement allegation pursuant to section 186.22, subdivision (b)(5), and the gang-murder special circumstance pursuant to section 190.2(a)(22) (count 1) are vacated. The matter is

57

remanded to the superior court.  On remand, the People shall have the opportunity to retry the conviction, the gang enhancement allegation, and the special circumstance finding in conformance with the current law.  The superior court shall then resentence Gross in light of the outcome of those proceedings, and in accordance with current section 1385, subdivision (c), as amended by Senate Bill 81.  In all other respects, the judgment is affirmed.


DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.